[Cite as *State ex rel. West v. Hoying*, 2025-Ohio-660.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Scott West, | : | |
| Relator, | : | No. 23AP-580 |
| v. | : | (REGULAR CALENDAR) |
| Lisa Hoying, In Her Official Capacity As Chair of the Ohio Parole Board et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on February 27, 2025

**On brief:** *Elizabeth Miller*, Public Defender, and *Max Hersch*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *George Horvath*, for respondents.

IN MANDAMUS

MENTEL, J.

{¶ 1} Relator, Scott West, brought this original action in mandamus against respondents, Lisa Hoying, chair of the Ohio Parole Board ("parole board"), Scott Widmer, member of the parole board, Brigid Slaton, chief hearing offer for the parole board, and Rebecca Vogel, hearing officer for the parole board. West sought a writ of mandamus ordering respondents to vacate the order that found he violated the conditions of his postrelease control and to enter an order finding insufficient evidence was presented to find him guilty of the charged violation.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate. On December 18, 2024, the magistrate issued the

appended decision, including findings of fact and conclusions of law, recommending this court grant relator's writ of mandamus.

{¶ 3} Respondents filed no objection to the magistrate's decision. "If no timely objections are filed, the court may adopt a magistrate's decision, unless it determines that there is an error of law or other defect evident on the face of the magistrate's decision." Civ.R. 53(D)(4)(c). Our review of the magistrate's decision reveals no error of law or other facial defect that would preclude adopting it. *See, e.g., State ex rel. Wyse v. Ohio Pub. Emp. Retirement Sys.,* 2024-Ohio-314, ¶ 2 (10th Dist.), citing *State ex rel. Alleyne v. Indus. Comm.,* 2004-Ohio-4223 (10th Dist.) (adopting the magistrate's decision where no objections were filed).

{¶ 4} Accordingly, having found there is no error of law or other evident defect, we adopt the magistrate's decision as our own, including findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we grant relator's writ of mandamus and order respondents to vacate the order finding West violated the conditions of his postrelease control and to enter a new order finding insufficient evidence was presented to find he violated the conditions of postrelease control.

*Writ of mandamus granted.*

BOGGS and LELAND, JJ., concur.

————————————

**APPENDINX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Scott West, | : | |
| Relator, | : | |
| v. | : | No. 23AP-580 |
| Lisa Hoying, In Her Official Capacity as Chair of the Ohio Parole Board, et al., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on December 18, 2024

*Elizabeth Miller,* Public Defender, and *Max Hersch,* for relator.

*Dave Yost,* Attorney General, and *George Horvath,* for respondents.

IN MANDAMUS

{¶ 5} Relator Scott West has filed this original action in mandamus against respondents Lisa Hoying, chair of the Ohio Parole Board ("parole board"), Scott Widmer, member of the parole board, Brigid Slaton, chief hearing officer for the parole board, and Rebecca Vogel, hearing officer for the parole board. West seeks a writ of mandamus ordering respondents to vacate the order finding West violated the conditions of his postrelease control and to enter an order finding insufficient evidence was presented to find West guilty of the charged violation. For the following reasons, the magistrate recommends granting the writ.

**I. Findings of Fact**

{¶ 6}   1. At the time of the filing of this action, West was an inmate incarcerated at the Lorain Correctional Institution in Grafton, Ohio.

{¶ 7}   2. Respondents, all of whom are sued in their official capacity, are members or hearing officers of the parole board. The parole board is an administrative section of the Ohio Adult Parole Authority ("APA"), which itself is a bureau-level administrative section of the Division of Parole and Community Services, which in turn is a division of the Ohio Department of Rehabilitation and Correction ("ODRC"). *See* R.C. 5149.02.

{¶ 8}   3. West was initially released from incarceration to postrelease control on April 19, 2023. At the time of his release, West had "1095 days of available Prison Sanction Time" for violations of postrelease control. (Supp. Stip. at 1.)

{¶ 9}   4. While on postrelease control, West was required to follow certain conditions of supervision or conditions of postrelease control. An updated version of the conditions of postrelease control were listed on a form signed by relator on April 20, 2023. Among the conditions of postrelease control, West agreed to abide by Rule 2, which provided as follows: "I will follow all orders given to me by my supervising officer or other authorized representatives of the Court or the Department of Rehabilitation and Correction, including, but not limited to obtaining permission from my supervising officer before changing my residence and submitting to drug testing. Failure to report for drug testing or impeding the collection process will be treated as a positive test result." (Stip. at A-4.) West also agreed to abide by Rule 8, which provided: "I agree to fully participate in, and comply with, Special Conditions that will include programming/intervention to address high and moderate domains if indicated by a validated risk tool selected by [ODRC] and any other special conditions imposed by the Parole Board, Court, or Interstate Compact." *Id.* The following special conditions were listed below Rule 8:

> Do not purchase, possess, or have under your control any pornography or sexually explicit material
>
> No Unsupervised Contact with Minors (supervising adult must be approved by the APA)
>
> Sex Offender Screening and Programming if indicated
>
> No contact with minors via the internet
>
> No social networking sites frequented by minors

*Id.*

{¶ 10} 5. Following the APA's investigation of potential violations of the prohibition on unauthorized contact with minors in the above special conditions, an order of hold was issued for West by an APA officer on April 24, 2023. West was placed into custody at the Fairfield County Jail on April 24, 2023.

{¶ 11} 6. In a notice of release violation hearing dated May 3, 2023 that was signed by West on the same date, West was charged with five counts of violating Rule 8. The following allegations were provided in support of the counts:

> [Count 1] On or about [April 19, 2023], in the vicinity of St. Clairsville, [Ohio], you had unsupervised contact with A.W., a minor/a child under the age of 18 without the approval of the APA.
>
> * * *
>
> [Count 2] On or about [April 19, 2023], in the vicinity of St. Clairsville, [Ohio], you had unsupervised contact with K.M., a minor/a child under the age of 18 without the approval of the APA.
>
> * * *
>
> [Count 3] On or about [April 19, 2023], in the vicinity of St. Clairsville, [Ohio], you had unsupervised contact with V.M., a minor/a child under the age of 18 without the approval of the APA.
>
> * * *
>
> [Count 4] On or about [April 21, 2023], in the vicinity of Thornville, [Ohio], you had unsupervised contact an unknown female minor/a child under the age of 18 without the approval of the APA.
>
> * * *
>
> [Count 5] On or about [April 21, 2023], in the vicinity of Thornville, [Ohio], you had unsupervised contact with V.M., a minor/a child under the age of 18 without the approval of the APA.

(Stip. at A-8–A-9.) West denied the charges. West also indicated that he did not waive the hearing, did not wish to make a statement, did not request witnesses for the hearing, and did request representation from the office of the Ohio Public Defender. A release violation hearing for the charged violations was scheduled to occur on May 30, 2023.

{¶ 12} 7. The APA issued an order of hold to the Franklin County Community Based Correctional Facility ("CBCF") for West on May 22, 2023. West was transferred from custody at the Fairfield County Jail to the Franklin County CBCF on May 22, 2023.

{¶ 13} 8. On May 23, 2023, the day after West was placed at the Franklin County CBCF, West's supervising parole officer requested that the May 30, 2023 hearing be canceled. This request was approved by an APA supervisor.

{¶ 14} 9. In a May 26, 2023 letter to the APA, Michael Caldwell, behavioral manager at the Franklin County CBCF, stated that West was being unsuccessfully terminated from the CBCF. With regard to the reason for termination, Caldwell stated: "On May 26, 2023, resident Scott West reported to staff that he refused any further participation in the CBCF program. Mr. West stated that he would rather go back to prison. Due to Mr. West refusing any further participation in the program, he is being terminated, unsuccessfully, from the program." (Stip. at A-18.)

{¶ 15} 10. For the period from April 24 through May 30, 2023, the APA deducted 37 days from West's total available prison sanction time.

{¶ 16} 11. In a notice of release violation hearing dated June 12, 2023 that was signed by West on the same date, West was charged with committing a violation of Rule 2 of the conditions of his postrelease control. The following factual allegations were provided in support of the charged violation: "On or about [May 30, 2023], in the vicinity of Columbus, [Ohio], you failed to comply with the Franklin County CBCF rules and regulations as directed by your supervising parole officer and [were] unsuccessfully terminated from the program." (Stip. at A-20.) West indicated on the notice that he denied committing the charged violation. In another form dated June 12, 2023, West indicated that he had retained counsel to represent him at the release violation hearing.

{¶ 17} 12. On June 12, 2023, West provided the following written statement regarding the charged postrelease control violation: "I was upset that my hearing had been canceled without my knowledge, that I had been sanctioned to CBCF after I expressed * * * that I did not want to go there. As of this date * * * I still have not received my sanction papers telling me I had to go there." (Stip. at A-23.)

{¶ 18} 13. In a violation report signed by West's parole officer on June 27, 2023, the following description was provided in support of the charged violation:

> The offender was recommended and approved for a violation release hearing that was set for [May 31, 2023]. The offender was accepted to the Franklin County CBCF with an admission date of [May 22, 2023]. The offender was ordered to successfully complete the Franklin County CBCF in lieu of a violation hearing. On [May 26, 2023], the offender informed the CBCF staff that he was refusing to complete any further programming at the facility. The offender had a telephone conversation with [and APA senior officer] on May 26, 2024 and was verbally instructed to complete the Franklin County CBCF. The offender refused to participate in the CBCF programming and was unsuccessfully terminated from the Franklin County CBCF on [May 26, 2023]. The offender was taken into custody by APA transport officers on [May 30, 2023] and transported to the Franklin County Jail to await violation hearing.

(Stip. at A-25.)

{¶ 19} 14. West's term of postrelease control "ran continuously" from his April 24, 2023 arrest until the postrelease control violation hearing on July 6, 2023. (Supp. Stip. at 2.)

{¶ 20} 15. At the July 6, 2023 hearing, the APA was represented by Parole Officer Terri Brown. West was represented by counsel.[1]

{¶ 21} 16. Parole Officer Robert Hollett testified at the hearing that he received a call from the Franklin County CBCF concerning West on May 26, 2023. A CBCF official told Hollett that West did not want to complete the CBCF program and asked Hollett to speak to West.

{¶ 22} As requested, Hollett spoke with West regarding the CBCF program. West was upset that he was at the CBCF and "was questioning why he wasn't having a hearing" as originally scheduled on May 30, 2023. (Stip., Ex. L at 10:40-10:48, 12:45-12:57.) According to Hollett, West said "he was served paperwork about the hearing and didn't know whether he was going to have the hearing still, or why he wasn't going to have the hearing." (Stip., Ex. L at 12:59-13:05.) Hollett explained that the APA "had the right to—or ability to take him out of the prison, put him in the CBCF, and cancel the hearing." (Stip.,

---

[1] No transcript of the hearing appears in the parties' stipulated submission of evidence in this matter. Rather, the parties have submitted an audio recording of the hearing, which is identified as Exhibit L in the stipulated submission of evidence.

Ex. L at 10:50-11:00.) Hollett instructed West that he needed to complete the CBCF program or he could be arrested and face a future violation hearing. West did not indicate to Hollett whether he intended to comply with the instruction.

{¶ 23} Hollett testified that on May 26, 2023 he received a call from a CBCF official who informed Hollett that West intended to stay and participate in the CBCF program. On May 30, 2023, Hollett learned that West had changed his mind and did not want to participate in the program. As a result, West was arrested. West was not accused of any infractions of CBCF facility rules.

{¶ 24} On cross-examination, Hollett stated that on May 23, 2023, Parole Officer Brown requested the cancelation of the May 30, 2023 hearing. Brown's request was approved by an APA parole services supervisor. Hollett agreed that the parole services supervisor was not a hearing officer or member of the parole board. A parole board hearing officer acknowledged receipt of the cancelation of the hearing by the APA.

{¶ 25} Hollett testified that the Franklin County CBCF was a lockdown facility. (Stip., Ex. L at 14:56-15:02.) Hollett agreed that permission was required to leave the facility.

{¶ 26} West's attorney attempted to ask Hollett whether he was aware of any authority for a supervising parole officer or parole officer to place someone in a lockdown facility such as CBCF without a hearing. The parole board hearing officer did not permit Hollett to answer the proposed question, but instead found that the APA had the authority to order a releasee into a CBCF without a hearing. With regard to the argument raised by West's counsel, the hearing officer stated that "the APA per the Ohio Revised Code 2967.28(F)(2) describes the options for sanctions without a hearing and (F)(3) describes the sanctions available after a hearing that allows APA—and this has been going on since October of 2020—that allows APA to cancel a hearing and take someone to the CBCF. (Stip., Ex. L at 16:12-16:35.) The parole board hearing officer noted the objection raised by West's counsel to this determination.

{¶ 27} 17. Michael Caldwell, behavioral manager at the Franklin County CBCF, was also called as a witness by the APA at the hearing. Caldwell stated that he completed a termination report for West. According to Caldwell, the reason for West's termination from the CBCF was that West "no longer wanted to be at the program; he wanted to go do his

time in prison." (Stip., Ex. L at 22:47-22:55.) Caldwell clarified that although his report incorrectly listed other violation behavior, West had no further violation behavior at the CBCF. Caldwell testified that West did participate in the CBCF from May 26, 2023 until his termination on May 30, 2023. On May 30, 2023, West informed Caldwell that he no longer wanted to be at the CBCF program and did not think that the program could help him.

{¶ 28} On cross-examination, Caldwell agreed that the Franklin County CBCF was a lockdown facility. Caldwell agreed that the CBCF was used by local judges as an alternative to jail confinement or prison. Caldwell stated that the APA also utilized the CBCF. Caldwell agreed that there were restrictions on the movement of individuals place in the CBCF:

> West's Attorney: And there are limitations on the movement of participants in the program, correct?
>
> Caldwell: Correct.
>
> West's Attorney: They may not leave the facility without permission, correct?
>
> Caldwell: Correct.
>
> West's Attorney: So, it is—it is a form of confinement, correct?
>
> Caldwell: Yes.

(Stip., Ex. L at 24:20-24:37.) Caldwell testified that West was polite and was not a behavioral problem at the facility.

{¶ 29} 18. Following the conclusion of the APA's case, West testified on his own behalf. West testified that he served a 6-year prison sentence in the custody of ODRC until he was released to postrelease control on April 19, 2023. According to West, he appeared at the office of Parole Officer Brown, who served as his parole officer, on the day of his release. Because Brown was not present that day, he returned the next day, as instructed. Brown instructed West to return to her office on April 24, 2023.

{¶ 30} According to West, when he complied and returned to Brown's office, Brown placed him in handcuffs. Brown told West that she had received an anonymous phone call that West had been present around minor children. West stated that his son, who was 16 years-old, was waiting outside the prison for West when he was released. West stated that he did not expect to see his son. West's sister brought West's son to see him when he was released. West rode home from the prison with his mother, father, and girlfriend. West's sister and her husband separately took West's son to another location. West stated that he

had no contact with his son, other than when he was first released from the prison. West denied the other allegations in the May 3, 2023 notice.

{¶ 31} After Brown placed West in handcuffs, he was transported to the Fairfield County Jail. Approximately nine business days later, Brown brought West a notice of the violation hearing. West denied all the charges. West stated that he intended to challenge four of the five charged violations at the hearing, but the hearing, which was scheduled to occur on May 30, 2023, never took place. West testified that he never received an adjudication by a hearing officer that required him to be placed at a CBCF.

{¶ 32} West testified that on May 19, 2023, he was called to the administrative building at the prison where he was incarcerated and told to sign release papers to be sent to the Franklin County CBCF on May 22, 2023. West was transferred from prison to the Franklin County CBCF on May 22, 2023.

{¶ 33} When West arrived at the CBCF, he went through orientation. West stated that he told his case manager at the CBCF that he had not had a hearing and did not know why he was at the CBCF. West told CBCF officials that he did not want to be there because he had never had his hearing. Although he described being upset by the lack of a hearing, West testified that he participated in classes at the CBCF. He was at the CBCF for seven days before he was transferred.

{¶ 34} West testified that the CBCF was a lockdown facility. West stated that he was not permitted to leave the facility or get a job. According to West, a person confined to the CBCF had to leave in shackles to go to a healthcare appointment.

{¶ 35} 19. Following the presentation of evidence at the hearing, West's counsel noted that the hearing officer did not permit argument regarding the lawfulness of the placement at the CBCF.

{¶ 36} 20. The parole board hearing officer stated that West "clearly [had] some thinking errors." (Stip., Ex. L at 58:03-58:06.) The hearing officer offered the following explanation to West:

> That you think you have no thinking errors is part of your problem. You've been locked up so long, there's nothing here to help you, and nothing that you've done this whole time that's helped you for programming. Just like your attorney explained, a CBCF is an alternative to prison for the courts— it is for APA. * * * There's less help for you while you're sitting

in prison than there is in a CBCF. That you can't think or that your attorney can't think that a CBCF couldn't benefit you or anybody who's been incarcerated as long as you have been, is part of our rehabilitation problem. * * * APA was following their orders and directives and the Ohio Revised Code when they canceled the hearing and sent you to the CBCF. They don't need your permission to do that.

(Stip., Ex. L at 47:07-47:58.) The hearing officer found West guilty of the charged violation. The APA recommended a prison sanction of 180 days. The hearing officer imposed a prison sanction of 113 days. Regarding West's jail-time credit, the hearing officer stated: "So, the time you did in the CBCF comes off your total prison sanction time. * * * You got jail-time credit for it. It is not a prison sanction. It was jail-time credit." (Stip., Ex. L at 59:23-59:33.)

**{¶ 37}** 21. The sanctions imposed at the July 6, 2023 hearing were reflected in an ODRC sanction receipt and prison term order ("sanction receipt") issued on the same date. In addition to the prison sanction, the sanction receipt reflected the following sanctions: "NUCWM (supervising adult must be approved by APA)" and "Complete a cognitive based program (T4C preferred)." (Stip. at A-26.)

**{¶ 38}** 22. Upon his release from incarceration, West had 1095 days of available prison sanction time. (Supp. Stip. at 1.) For the period from April 24 through May 30, 2023, the APA deducted 37 days from West's total available prison sanction time. (Supp. Stip. at 2.) West received jail-time credit for 37 days as a result of his incarceration from May 31 through July 6, 2023. *Id.* Following the sanction imposed, West had 908 days of remaining prison sanction time available. *Id.*

**{¶ 39}** 23. West's postrelease control supervision period was tolled while he was in custody for the prison sanction imposed under the July 6, 2023 sanction receipt. (Supp. Stip. at 3.) West remains on postrelease control.[2]

**{¶ 40}** 24. West, through counsel, requested reconsideration of the postrelease control violation findings in an email to the parole board. West noted that before the July 6, 2023 hearing, West's former counsel contacted the parole board hearing officer to argue that West "was bound to follow only *lawful* orders of his supervising parole officer. And because the initial order that Mr. West remain in the CBCF was unlawful, he should not be

---

[2] At oral argument in this matter, counsel for respondents agreed that West remains on postrelease control.

sanctioned for failing to comply with its programming." (Emphasis sic.) (Stip. at A-31.) West stated that before the hearing began, the parole board hearing officer informed West and his former counsel that "she was not going to consider this argument and that the hearing would focus solely on Mr. West's compliance with CBCF programming." *Id.* Based on the arguments made by his former counsel, West asked for reconsideration because under Ohio Adm.Code 5120:1-1-17(D), he "could not have been lawfully ordered to remain in a CBCF because it is a lockdown facility, and any 'sanction of confinement' may only be imposed 'only by a parole board member or hearing officer at a hearing.' " *Id.* Since the order placing West in the CBCF was not issued in this manner, West argued that the order was unlawful and, citing Ohio Adm.Code 5120:1-1-12(B), stated that he was "bound to follow only 'lawful orders' of his parole officer." *Id.*

{¶ 41} 25. West commenced this action by filing his complaint for writ of mandamus on September 27, 2023.

{¶ 42} 26. West filed an amended complaint on November 20, 2023.

{¶ 43} 27. The parties filed a joint stipulated submission of evidence on January 18, 2024. On the same day, the parties also filed the audio recording of the postrelease control violation hearing.

{¶ 44} 28. On July 18, 2024, after the matter was briefed and argued, the parties jointly filed supplemental evidence under the terms of magistrate's orders issued June 27 and July 10, 2024.

## II. Discussion and Conclusions of Law

{¶ 45} West asserts his constitutional right to due process was violated when, without a hearing or an opportunity to contest the alleged violations, he was sanctioned to reside in a CBCF and complete its programming due to alleged violations of postrelease control. West argues the sanction was unlawful on this basis and, therefore, could not support a finding that he violated Rule 2 of the conditions of postrelease control. As a result, West asserts he is entitled to a writ of mandamus ordering respondents to vacate the finding that he violated the conditions of his postrelease control because there was insufficient evidence presented to support such a finding. Respondents argue that mandamus will not lie because this matter is moot. In the alternative, respondents argue West cannot establish

entitlement to relief in mandamus because the APA had the authority to impose a residential sanction at a CBCF for a term of up to six months.

## A. Mandamus

{¶ 46} A writ of mandamus is an extraordinary remedy " 'issued in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specifically enjoins as a duty.' " *State ex rel. Russell v. Klatt*, 159 Ohio St.3d 357, 2020-Ohio-875, ¶ 7, quoting R.C. 2731.01. *See State ex rel. Blachere v. Tyack*, 10th Dist. No. 22AP-478, 2023-Ohio-781, ¶ 13 (stating that the purpose of mandamus is to compel the performance of an act that the law specifically enjoins as a duty resulting from an office, trust, or station). In order for a writ of mandamus to issue in this matter, West must establish by clear and convincing evidence (1) a clear legal right to the requested relief, (2) a clear legal duty on the part of respondents to provide it, and (3) the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Gil-Llamas v. Hardin*, 164 Ohio St.3d 364, 2021-Ohio-1508, ¶ 19. " 'Clear and convincing evidence' is a measure or degree of proof that is more than a preponderance of the evidence but less than the beyond-a-reasonable-doubt standard required in a criminal case; clear and convincing evidence produces in the trier of fact's mind a firm belief of the fact sought to be established." *State ex rel. Ware v. Crawford*, 167 Ohio St.3d 453, 2022-Ohio-295, ¶ 14, citing *State ex rel. Miller v. Ohio State Hwy. Patrol*, 136 Ohio St.3d 350, 2013-Ohio-3720, ¶ 14. A writ of mandamus may issue where there was insufficient evidence to support a postrelease control violation finding that resulted in the revocation of release. *State ex rel. Braddy v. Hoying*, 10th Dist. No. 23AP-197, 2023-Ohio-2597, ¶ 20, citing *State ex rel. Barber v. Hoying*, 10th Dist. No. 23AP-71, 2023-Ohio-2204, ¶ 11.

## B. Postrelease Control Under Ohio Law

{¶ 47} R.C. 2967.28 addresses postrelease control, including the classes of offenses for which postrelease control must be imposed, requirements for conditions of postrelease control, and requirements for proceedings upon allegations of a violation of postrelease control. Under the statute, before certain specified categories of offenders are released from incarceration on postrelease control, the parole board must impose "one or more post-release control sanctions to apply during the prisoner's period of post-release control." R.C.

2967.28(D)(1). When the parole board imposes conditions of postrelease control on a releasee, the releasee, at the time of release from incarceration, "shall be under the general jurisdiction of the [APA] and generally shall be supervised by the field services section through its staff of parole and field officers as described in [R.C. 5149.04], as if the offender had been placed on parole." R.C. 2967.28(F)(1). "Releasee" is defined as "an inmate who has been released from confinement pursuant to [R.C. 2967.28] under a period of post-release control that includes one or more post-release control sanctions." R.C. 2967.01(J). R.C. 2967.15(A) provides in pertinent part that "prior to the revocation by the [APA] of a person's pardon, parole, or other release and prior to the imposition by the parole board or adult parole authority of a new prison term as a post-release control sanction for a person, the adult parole authority shall grant the person a hearing in accordance with rules adopted by [ODRC]."

{¶ 48} If the APA determines that a releasee has violated a postrelease control condition, the APA "may impose a more restrictive sanction on the releasee, in accordance with the standards established under [R.C. 2967.28(E)] * * * or may report the violation to the parole board for a hearing pursuant to [R.C. 2967.28(F)(3)]." R.C. 2967.28(F)(2). However, the APA "may not, pursuant to [R.C. 2967.28(F)(2)], increase the duration of the releasee's post-release control or impose as a post-release control sanction a residential sanction that includes a prison term," though the APA "may impose on the releasee any other residential sanction, nonresidential sanction, or financial sanction that the sentencing court was authorized to impose pursuant to [R.C.] 2929.16, 2929.17, and 2929.18." R.C. 2967.28(F)(2).

{¶ 49} Under R.C. 2967.28(F)(3), the parole board may hold a hearing on any alleged violation of a postrelease control sanction or condition imposed on a releasee. "When appropriate," the parole board "may impose as a post-release control sanction a residential sanction that includes a prison term." R.C. 2967.28(F)(3). The parole board "shall consider a prison term as a post-release control sanction imposed for a violation of post-release control when the violation involves a deadly weapon or dangerous ordnance, physical harm or attempted serious physical harm to a person, or sexual misconduct." R.C. 2967.28(F)(3). "The period of a prison term that is imposed as a post-release control

sanction under [R.C. 2967.28(F)(3)] shall not count as, or be credited toward, the remaining period of post-release control."

{¶ 50} Under R.C. 2967.28(E), ODRC is required to adopt rules related to postrelease control, including rules related to violations of postrelease control. To that end, ODRC must adopt rules that do the following:

> Establish standards to be used by the [APA] or parole board in imposing further sanctions under [R.C. 2967.28(F)] on releasees who violate post-release control sanctions, including standards that do the following:
>
> (a) Classify violations according to the degree of seriousness;
>
> (b) Define the circumstances under which formal action by the parole board is warranted;
>
> (c) Govern the use of evidence at violation hearings;
>
> (d) Ensure procedural due process to an alleged violator;
>
> (e) Prescribe nonresidential community control sanctions for most misdemeanor and technical violations;
>
> (f) Provide procedures for the return of a releasee to imprisonment for violations of post-release control.

R.C. 2967.28(E)(5).

{¶ 51} ODRC adopted Ohio Adm.Code 5120:1-1-17, which governs responses to violations of postrelease control, including the types of sanctions that may be imposed by either the APA or parole board. Ohio Adm.Code 5120:1-1-17(C) provides that "[i]n general, the most restrictive sanction imposed for most violations of the conditions of release that do not constitute new criminal offense behavior will be a nonresidential community sanction." Furthermore, this administrative rule provides that the sanctions that may be imposed by the APA without a hearing include, but are not limited to, the following:

> (1) Community service;
>
> (2) Office reporting;
>
> (3) Upgrades in supervision levels;
>
> (4) Mandatory employment;
>
> (5) Structured supervision activities;
>
> (6) Summons before a unit supervisor;
>
> (7) Substance abuse monitoring/treatment;
>
> (8) Residential curfew;

(9) More frequent reporting requirements;

(10) Formal written reprimand;

(11) Program placement;

(12) Summons to appear before the parole board for review of
the offender's performance on release.

(13) Electronic monitoring.

Ohio Adm.Code 5120:1-1-17(C). Pursuant to Ohio Adm.Code 5120:1-1-17(D), a prison term sanction "may be imposed for violations of post-release control sanctions or a condition of supervision only by a parole board member or hearing officer at a hearing." Notably, for purposes of this matter, that section also provides that a "parole board member or hearing officer imposing a sanction of confinement under this paragraph may require that the sanction be served in a state correctional institution, local jail, *community-based correctional facility*, or other locked facility approved by the division of parole and community services." (Emphasis added.) Ohio Adm.Code 5120:1-1-17(D)(2).

## C. Mootness

{¶ 52} Initially, it is necessary to address respondents' argument that this matter is moot. " 'It is the duty of every judicial tribunal to decide actual controversies' and withhold advice upon moot questions." *State ex rel. Grendell v. Geauga Cty. Bd. of Commrs.*, 168 Ohio St.3d 154, 2022-Ohio-2833, ¶ 9, quoting *Fortner v. Thomas*, 22 Ohio St.2d 13, 14 (1970). An action becomes moot " ' "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." ' " *State ex rel. Gaylor, Inc. v. Goodenow*, 125 Ohio St.3d 407, 2010-Ohio-1844, ¶ 10, quoting *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979), quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969). *See The Brunner Firm Co., L.P.A. v. Bussard*, 10th Dist. No. 07AP-867, 2008-Ohio-4684, ¶ 35 ("An action may be rendered moot when the litigant receives the relief sought before completion of the lawsuit."). "Conversely, if an actual controversy exists because it is possible for a court to grant the requested relief, the case is not moot, and a consideration of the merits is warranted." *Gaylor* at ¶ 11. *See State v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163, ¶ 7 (stating that "a case is not moot if an actual controversy remains between the litigants"). Absent an applicable exception to mootness, when the actual controversy in

the case ceases to exist, the court "must dismiss the case as moot." *M.R. v. Niesen*, 167 Ohio St.3d 404, 2022-Ohio-1130, ¶ 7.

{¶ 53} West seeks relief in the form of a writ of mandamus ordering respondents to vacate the finding that he violated the conditions of his postrelease control. Respondents argue that this matter is moot because "West's sanctions have expired." (Respondents' Brief at 3-4.) It is undisputed that the sanction of imprisonment imposed as a result of the July 6, 2023 finding that he violated the conditions of his postrelease control has expired. However, this does not end the analysis.

{¶ 54} As noted above, pursuant to R.C. 2967.28(F)(3), "the period of a prison term that is imposed as a post-release control sanction under this division shall not count as, or be credited toward, the remaining period of post-release control." The parties' stipulation reflects that West's postrelease control supervision period was tolled while he was in custody for the prison sanction imposed by the parole board under R.C. 2967.28(F)(3). There is also no dispute that West remains on postrelease control. Furthermore, the July 6, 2023 sanction receipt reflects that additional postrelease control sanctions, including a sanction to "[c]omplete a cognitive based program," were imposed as a result of the postrelease control violation finding. (Stip. at A-26.) If this court were to grant the requested relief, i.e., issue a writ ordering respondents to vacate the postrelease control violation finding that served as the basis for West's prison sanction, the tolling mandated under R.C. 2967.28(F)(3) would necessarily be implicated, as would any additional postrelease control sanctions remaining in effect. As a result, West maintains a legally cognizable interest in the outcome, and it is possible for this court to grant the requested relief. Therefore, this matter is not moot.

## D. Whether West's Due Process Rights Were Violated When He Was Sanctioned to a CBCF

{¶ 55} "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). The Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution guarantee due process of law. *State ex rel. Haylett v. Ohio Bur. of Workers' Comp.*, 87 Ohio St.3d 325, 331 (1999) ("The Fourteenth Amendment to the

United States Constitution prohibits any state from depriving 'any person of life, liberty, or property, without due process of law.' "); *Sorrell v. Thevenir*, 69 Ohio St.3d 415, 422 (1994), citing *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 544 (1941) (stating that the Ohio Constitution's " 'due course of law' provision" in Article I, Section 16 "is the equivalent of the 'due process of law' provision in the Fourteenth Amendment to the United States Constitution"). In general, when considering whether a person's due process rights were violated, a court must "first ask whether there exists a liberty or property interest of which a person has been deprived, and if so [the court] ask[s] whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

### 1. Whether West Was Deprived of a Protected Liberty Interest

{¶ 56} "The Due Process Clause applies when government action deprives a person of liberty or property; accordingly, when there is a claimed denial of due process we have inquired into the nature of the individual's claimed interest." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' * * * or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). *See Sandin v. Conner*, 515 U.S. 472, 483-84 (1995) (recognizing that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause").

{¶ 57} Among liberty interests created by state law, an individual released from incarceration on parole possesses a liberty interest in remaining free from confinement in prison. *Morrissey v. Brewer*, 408 U.S. 471, 480-84 (1972). Though there is no constitutional or inherent right to parole, "once a State grants a prisoner the conditional liberty properly dependent on the observance of special parole restrictions, due process protections attach to the decision to revoke parole." *Vitek v. Jones*, 445 U.S. 480, 488 (1980), citing *Morrissey* at 484. *See State ex rel. Jackson v. McFaul*, 73 Ohio St.3d 185, 186 (1995) (recognizing "revocation of parole implicates a liberty interest"). In examining the nature of the liberty interest at stake for an individual on parole, the Supreme Court of the United States has contrasted the liberty of a parolee with that of a prisoner:

> The liberty of a parolee enables him to do a wide range of
> things open to persons who have never been convicted of any

> crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked.
>
> We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others.

*Morrissey* at 482.

{¶ 58} An individual released from incarceration on probation possesses the same liberty interest in remaining free from a return to incarceration as one released on parole. *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973). *See Vitek* at 488; *State ex rel. Mango v. Ohio Dept. of Rehab. & Corr.*, 169 Ohio St.3d 32, 2022-Ohio-1559, ¶ 18. Thus, it is well-established the revocation of parole or probation "result[s] in a loss of liberty," entitling an individual to certain due process protections. *Gagnon* at 782.

{¶ 59} This matter differs from *Morrissey* and *Gagnon* in that there was no revocation of parole or probation. Though he was not returned to prison, i.e., a state correctional institution,[3] as a result of the alleged postrelease control violations, West nevertheless asserts he was deprived of a liberty interest when he was sanctioned with placement in a CBCF. West argues that he had an interest in avoiding particular conditions of confinement, including confinement in a CBCF, after his release from incarceration on postrelease control. West also contends Ohio law creates a presumption in favor of nonresidential sanctions for the type of postrelease control violation that he was alleged to have committed. Respondents argue, without citation to any legal authority, that "there is

---

[3] *See* R.C. 2967.01(A).

no reasonable expectation of liberty that includes not being placed in a CBCF." (Respondents' Brief at 10.) Although West was not confined in a state correctional institution as a sanction for the alleged postrelease control violations, the nature of West's confinement in the CBCF bears striking and constitutionally significant similarities to the liberty interest at stake in cases of parole or probation revocation.

{¶ 60} Under Ohio law, a CBCF must include a "a physical facility that will be used for the confinement of persons sentenced to the facility and program by a court * * * or persons otherwise committed or admitted pursuant to law to the facility and program." R.C. 2301.52(A). *See State v. Snowder*, 87 Ohio St.3d 335, 337 (1999). A CBCF must "be a secure facility that contains lockups and other measures sufficient to ensure the safety of the surrounding community." R.C. 2301.52(A)(1). *See State v. Napier*, 93 Ohio St.3d 646, 647 (2001).

{¶ 61} The Supreme Court of Ohio has previously examined the nature of confinement in a CBCF. In *Snowder*, the court considered whether a defendant required to enter a CBCF could be convicted for escape pursuant to R.C. 2921.34. The court noted that R.C. Chapter 2921, which sets forth criminal offenses against justice and public administration—including the offense of escape, contains definitions for the term "detention" under R.C. 2921.01(E) and "detention facility" under R.C. 2921.01(F). The court determined that while a defendant was in the CBCF, they were "confined" for purposes of R.C. 2967.191, the statute providing for jail-time credit. *Id.* at 336. Based on the statutory requirements for a CBCF and the fact that the defendant was not permitted to leave without permission, the court found that it "appear[ed] beyond doubt that entry into a CBCF constitutes confinement." *Id.* at 337. As a result, the court held that a person in a CBCF was detained in a detention facility under R.C. 2921.01(E) and (F) and, as a result, was subject to conviction for escape under R.C. 2921.34.

{¶ 62} In *Napier*, the court considered whether the *entire* amount of time served in a CBCF qualified as confinement under R.C. 2967.191 for purposes of calculating jail-time credit. The state argued that " 'confinement' should not apply en bloc to the entire amount of time spent in a CBCF," but rather only where the prisoner was confined "to a lockdown setting, where a prisoner cannot leave the facility under any circumstances." *Id.* at 647. The court disagreed, finding that the state's argument ran counter to the holding of *Snowder*.

The court held that "all time served in a CBCF constitutes confinement" for purposes of calculating jail-time credit under R.C. 2967.191. *Id.* at 648.

{¶ 63} The record in this matter provides additional support for finding the time West served in the CBCF constitutes confinement. West testified that he was not able to leave the CBCF of his own accord. Nor could he secure employment. According to West, he was not permitted to be released to medical appointments unless he was shackled. Caldwell, the behavioral manager at the CBCF, agreed that the CBCF was a form of confinement used as an alternative to being confined in jail or prison.

{¶ 64} Consistent with the reasoning in *Snowder* and *Napier*, the record in this matter establishes that West's confinement in the CBCF placed substantially similar restraints on West's liberty as confinement in a prison as a result of a parole or probation revocation. Though respondents offer the truism that "CBCFs are indisputably not prisons," they provide no explanation regarding any difference in the loss of liberty resulting from confinement in a CBCF, rather than a prison. (Respondents' Brief at 9.) Much like the description of restrictions on a parolee's liberty in *Morrissey*, persons released from incarceration on postrelease control are subject to a number of restrictions not applicable to other persons. *See* R.C. 2967.28(D)(1). Yet, even with these restrictions, the condition of a releasee is still markedly different from confinement in a prison. Just like the "liberty of a parolee," the liberty of a person on postrelease control "although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' " on the releasee. *Morrissey*, 408 U.S. at 482. Placement in a CBCF extinguishes those core values of liberty enjoyed by a releasee.

{¶ 65} As explained with regard to parolees in *Morrissey* and applied to probationers in *Gagnon*, individuals who have been released from incarceration on postrelease control are afforded substantial, albeit conditional and somewhat restricted, liberty. Included within this guarantee of liberty is "at least an implicit promise" that a return to confinement will only occur if the releasee violates the conditions of supervision. *Morrissey* at 482. Though not all sanctions for postrelease control violations may implicate a protected liberty interest, placement in a CBCF, a form of a detention facility, deprived West of the conditional liberty afforded to individuals subject to postrelease control on the basis of alleged violations of those conditions. *See Morrissey* at 480 ("Revocation deprives

an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions."); *Vitek*, 445 U.S. at 488. This deprivation of liberty required procedural protections. *See Morrissey* at 482 (stating that "[b]y whatever name, the liberty [of a parolee] is valuable and must be seen as within the protection of the Fourteenth Amendment"). *See also Vitek* at 490-91, quoting *Wolff*, 418 U.S. at 558 (stating that "if the State grants a prisoner a right or expectation that adverse action will not be taken against him except upon the occurrence of specified behavior, 'the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed' ").

{¶ 66} In addition to the nature of his confinement, West also argues that he has a liberty interest based on presumptions in favor of nonresidential sanctions in Ohio law and administrative rules. R.C. 2967.28(E) commands ODRC to adopt rules that establish standards to be used by the APA or parole board in imposing further sanctions. Among the standards, ODRC was required to adopt a rule establishing a standard that "[p]rescribe[s] nonresidential community control sanctions for most misdemeanor and technical violations." R.C. 2967.28(E)(5)(e). Consistent with this, Ohio Adm.Code 5120:1-1-17(C) provides that "the most restrictive sanction imposed for most violations of the conditions of release that do not constitute new criminal offense behavior will be a nonresidential community sanction." In this matter, West was not charged with violating a condition of release that constituted new criminal offense behavior. Rather, as respondents note, West was charged with violating a "Special Condition" imposed by the parole board. (Respondents' Brief at 13.) Though not necessary to find that West was deprived of a protected liberty interest, the presumption in favor of nonresidential sanctions in Ohio statutory and administrative provisions supplements the finding that West had a liberty interest in remaining free from confinement in a CBCF.

## 2. Whether Procedures Were Sufficient to Protect Liberty Interest

{¶ 67} Having found West was deprived of a constitutionally protected liberty interest, it is next necessary to examine whether the procedures employed were constitutionally sufficient to satisfy due process. " ' "Due process," unlike some legal rules,

is not a technical conception with a fixed content unrelated to time, place and circumstances.' " *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961), quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162 (1951) (Frankfurter, J., concurring). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* at 481. Because of this, courts "have declined to establish rigid rules and instead have embraced a framework to evaluate the sufficiency of particular procedures." *Wilkinson*, 545 U.S. at 224. Under this framework, determination of the requirements of due process requires consideration of three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### a. West's Private Interest

{¶ 68} The first *Mathews* factor considers the private interest at stake. West's private interest "is the most elemental of liberty interests—the interest in being free from physical detention by one's own government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."). Courts considering this interest must be "careful not to 'minimize the importance and fundamental nature' of the individual's right to liberty." *Foucha* at 80, quoting *United States v. Salerno*, 481 U.S. 739, 750 (1987).

{¶ 69} It bears repeating that the physical detention to which West was subjected in this case was not imprisonment in a state correctional facility. Nevertheless, the CBCF into which West was placed was a lockdown institution. He was not able to leave the CBCF, secure gainful employment, or enjoy many of the other benefits of liberty that were available to him prior to his confinement in the CBCF. *See Morrissey* at 482 ("The parolee * * * can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life."). Even though, prior to placement in the CBCF,

West's liberty was restricted by the conditions of supervision for postrelease control, West enjoyed a form of liberty that "include[ed] many of the core values of unqualified liberty." *Morrissey* at 482. Due to the importance and fundamental nature of the liberty interest at stake, the magistrate finds the first *Mathews* factor weighs heavily in favor of West.

**b. Risk of an Erroneous Deprivation of the Private Interest and the Probable Value of Additional Procedural Safeguards**

{¶ 70} The second *Mathews* factor considers "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews* at 335. In this case, West was notified that "a Release Violation Hearing to determine whether or not you have violated the terms/conditions of your release will be held." (Stip. at A-7.) This notice, appearing to follow the notice requirements in *Morrissey*, contained a statement of the parole violations West was alleged to have committed and a list of rights that West was to be afforded at the scheduled hearing. *See Morrissey* at 486-87. *See also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). However, despite West's denial of the charged violations and request for legal representation at the hearing, the hearing never took place and West's request for counsel went unfulfilled.

{¶ 71} Notice of the charged violations is meaningless without—at the barest minimum—an opportunity to be heard. "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). "It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). Leaving aside the notice and the opportunity for West to request counsel for a hearing that was never to occur, respondents point to no procedural safeguards in place to prevent an erroneous deprivation. Under respondents' position, *nothing* is required before an APA parole officer finds a postrelease control violation has been committed and issues an order locking up a releasee in a CBCF,

that is, a lockdown detention facility, so long as that facility is not called a prison.[4] Even though notice of the alleged violations was provided in this instance, respondents do not assert it was required. Moreover, although Officer Hollett testified that the request to cancel West's hearing was approved by an APA parole services supervisor, such supervisor was not a hearing officer or member of the parole board. Nor do respondents assert or provide evidence that such an approval process is required in all instances before a releasee is sanctioned to a CBCF.

{¶ 72} By initially scheduling a hearing and recognizing the rights West would be afforded at such hearing, respondents appear to recognize the probable value of such procedural safeguards.[5] Respondents further recognize that the "APA has significant discretion to impose post-release control sanctions." (Respondents' Brief at 8.) Yet, this significant discretion, if anything, heightens the risk of an erroneous deprivation of the liberty interest at stake through the possibility of arbitrary action. *See Roller v. Holly*, 176 U.S. 398, 409 (1900) ("The right of a citizen to due process of law must rest upon a basis more substantial than favor or discretion."). As there is a substantial, if unquantifiable, risk of an erroneous deprivation and significant value in additional procedural protections, the magistrate finds the second *Mathews* factor weighs heavily in favor of West.

**c. The Government's Interest**

{¶ 73} The third *Mathews* factor considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* at 335. Examination of the government's interest "includes the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing." *Id.* at 347. Though respondents do not directly address this factor in their brief, they do point to the differences between the sanction of a CBCF and incarceration. Specifically, respondents state that "[i]f West had not been accepted into the CBCF, the APA

---

[4] When asked at argument what procedural safeguards were in place, counsel for respondents pointed to unspecified "internal methods available to the APA. * * * They can investigate." Counsel also stated that the APA was "not doing this willy-nilly."

[5] At the hearing, the parole board hearing officer stated that APA's practice of canceling a hearing and sending a releasee to a CBCF had been "going on since October of 2020." (Stip., Ex. L at 16:27-16:30.) It is unclear whether a hearing was provided before placement in a CBCF prior to this point.

would have moved forward with a hearing, and if guilt was determined, West could [have been] sanctioned to serve a maximum of 270 days of prison sanction time at an ODRC prison." (Respondents' Brief at 14.) Respondents state that "the CBCF placement was to last no longer than 6 months." *Id.*[6] In addressing this factor, West also points to Officer Hollett's statement that the APA will "at times take people out of the prison and put them in a CBCF when we feel it's going to be better for them and then we cancel the hearing." (Stip., Ex. L at 13:06 - 13:12.)

{¶ 74} As discussed with regard to the second *Mathews* factor, West was initially scheduled to have a hearing, at which West would be afforded various other procedural rights. West was also offered an opportunity to request counsel. Under relevant Ohio law and administrative code provisions, there already exists a hearing process for postrelease control violations. Thus, the administrative function of the responsible agency is already well-suited to providing additional procedural protections, including a hearing prior to imposing a CBCF sanction. In the absence of any evidence from respondents to the contrary, any administrative burden resulting from additional procedural requirements has not been demonstrated to be substantially weighty.

{¶ 75} Analysis of the fiscal burden does not lead to a different conclusion. "Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision." *Mathews* at 348. Respondents provide no evidence regarding any additional costs that may be incurred as a result of requiring hearings prior to imposing a CBCF sanction. Though there may be some additional administrative costs associated with such hearings, the "incremental cost resulting from the increased number of hearings" does not weigh heavily in analysis of this factor. *Mathews* at 347.

{¶ 76} Respondents have not substantiated any fiscal or administrative burden that would weigh significantly against West's liberty interest. Moreover, any confinement of a releasee in a CBCF would also add some additional fiscal and administrative burdens.

---

[6] Respondents also state in their brief that "126 days was the typical amount of time for successful completion of CBCF programming in calendar year 2023." (Respondents' Brief at 14.) No citation is provided for this assertion, nor does review of the stipulated evidence reveal any support for it. As a result, the magistrate declines to consider respondents' assertion in weighing the *Mathews* factors.

Finally, though there was an assertion that a CBCF sanction would be "better" for a releasee than a prison sanction, this assertion assumes that there exists sufficient evidence to sanction the releasee to prison—a sanction that cannot be issued absent a hearing and other procedural protections. As a result, this assertion does not add any weight to the analysis of the government's interest. As a result, the magistrate concludes that the third *Mathews* factor also favors West.

### d. Additional Procedural Protections Necessary

{¶ 77} Balancing the *Mathews* factors leads to the conclusion that insufficient procedural protections were provided to adequately safeguard West's liberty interest. At a minimum, due process entitled West to a hearing prior to being placed in a CBCF. *See Mathews* at 348 ("The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness."). Because a hearing was not provided, West's due process rights were violated.

### E. Due Process in Release Revocation Proceedings

{¶ 78} Having found West's due process rights were violated when he was placed in a CBCF without a hearing or other procedural protections, the magistrate turns to West's argument that the postrelease control violation for failing to comply with the CBCF sanction was not supported by sufficient evidence.

{¶ 79} Because revocation proceedings are not criminal prosecutions, a person subject to a revocation proceeding is not entitled to the full range of procedural rights accorded to a defendant in a criminal trial. *See Morrissey* at 480 (stating that "revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations"); *Barber* at ¶ 12. "The minimal requirements of due process in revocation proceedings include, but are not necessarily limited to, the following: (1) written notice of the alleged violations; (2) disclosure to the person subject to revocation of the evidence against them; (3) an opportunity to be heard in person and to present witnesses as well as documentary evidence; (4) the right to confront and cross-examine adverse witnesses, unless the hearing officer finds good cause to prohibit it; (5) a neutral and detached hearing body; and (6) a

written statement by the factfinder as to the evidence relied on and the reasons for revocation." *Barber* at ¶ 12, citing *State v. Cardinal*, 10th Dist. No. 09AP-623, 2010-Ohio-3836, ¶ 15. *See also* Ohio Adm.Code 5120:1-1-18(A)(5) (listing other rights for a releasee at a postrelease control release revocation hearing).

{¶ 80} In addition to the due process protections listed above, a postrelease control violation finding that results in the revocation of release must be based on sufficient evidence in order to satisfy the requirements of due process. *See Barber* at ¶ 27; *Braddy*, 2023-Ohio-2597, at ¶ 20; *Mango* at ¶ 18. A decision finding that a releasee has violated the conditions of postrelease control is supported by sufficient evidence where there exists "substantial evidence" to support the decision. *Mango* at ¶ 18. Substantial evidence exists where "the evidence presented by the APA, if believed, is sufficient to satisfy the burden of proof." *Id.* At release revocation proceedings for a postrelease control violation, a violation must be established by the preponderance of the evidence. *Braddy* at ¶ 21; Ohio Adm.Code 5120:1-1-18(A)(3). Thus, there exists sufficient evidence to support a finding of a postrelease control violation where the evidence presented by the APA, if believed, demonstrates the violation by a preponderance of the evidence.

{¶ 81} West was found to have committed a postrelease control violation based on the allegation that he failed to comply with the Franklin County CBCF rules and regulations as directed by his supervising parole officer, resulting in his unsuccessful termination from the CBCF program. West argues that he was not obligated to comply with the order to successfully complete his placement in the CBCF because such order was issued in violation of his constitutional rights and, therefore, was unlawful. Provisions related to postrelease control in the Ohio Administrative Code support West's argument. Ohio Adm.Code 5120:1-1-01 defines a "releasee" as "[a]n inmate who has been released from confinement pursuant to section 2967.28 of the Revised Code under a period of post-release control that includes one or more post-release control sanctions." *See* R.C. 2967.01(J). Ohio Adm.Code 5120:1-1-12(B) contains several "minimum conditions of release" that the parole board "shall impose" on a releasee. Included among those required conditions is the condition that the "releasee shall comply with **all lawful orders** given to the releasee by the department of rehabilitation and correction, its authorized agents, or its

representatives, which shall include any sanctions that may be imposed in response to violation behavior at any time during supervision." (Emphasis added.) Ohio Adm.Code 5120:1-1-12(B)(3). Because the order sanctioning West with placement in the CBCF was issued in violation of West's due process rights, and therefore not lawful, the evidence presented at the postrelease control hearing was legally insufficient to support a finding that West committed the charged postrelease control violation.

## F. Conclusion

{¶ 82} For the foregoing reasons, the magistrate finds West has established a clear legal right to the requested relief, that respondents were under a clear legal duty to provide it, and the absence of an adequate remedy at law. Accordingly, it is the decision and recommendation of the magistrate that this court should issue a writ of mandamus ordering respondents to vacate the order finding West violated the conditions of his postrelease control and to enter a new order finding insufficient evidence was presented to find West violated the conditions of postrelease control.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

### NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.